# Exhibit 47

*Department of Conservation of Louisiana*      9

43-00-00
43

As Louisiana's representative on the Interstate Oil Compact Commission, and as Emergency Coordinator of Mines for Louisiana, it has been incumbent upon the Commissioner to attend numerous meetings of these agencies held during the past two years in all parts of the nation. In December of 1943, Louisiana and its Conservation Department was honored, by the election of the Commissioner as a member of the Executive Board of the Interstate Oil Compact Commission.

Louisiana's well spacing law, Act 157 of 1940, which is now recognized as one of the finest oil conservation laws among the oil producing states in the nation, ran the gamut of litigation through most of the courts of the land, and finally emerged unscathed when the United States Supreme Court upheld its legality in the latter part of 1943.

Another outstanding accomplishment of the 1942-43 biennium was the fact that the Department has done more for the advancement of the oyster industry than ever before in any other two-year period.

The largest oyster shell planting program ever attempted in Louisiana was inaugurated in 1943. More than 90,000 barrels of oyster shells were planted in various oyster areas, and this is expected to make available in two years more than 360,000 additional barrels of oysters.

The Conservation Department has made plans to pur chase 10,000 northern black muskrats which will be interbre with native muskrats in all marsh areas of the State with view of greatly increasing the size and quality of muskr

214 *Sixteenth Biennial Report of the*

# MINERALS DIVISION
## H. W. BELL, *Director*

This report on the oil and gas production of Louisiana for the biennium of 1942-1943 is primarily a record of the demand, especially in the case of oil, as created by the "Second World War."

After war was declared early in December, 1941, the control of the production of oil for the nation was assigned to the Office of the Petroleum Coordinator, later delegated to the Petroleum Administration for War. Starting with January, 1944, Louisiana was asked to produce some 30,000 barrels per day less than had been the current rate. Production curtailment for all states was instituted as a "war conservation" measure to remain effective until the situation could be surveyed and various necessary activities could approach maturity. In other words, the production of oil was minimized for some months until the situation developed so that the war and attendant industries forced an increased production.

The crude oil production in Louisiana for December, 1941, averaged 360,000 barrels per day. The figures set in Washington are shown below. Starting with April, 1942, the assigned allowable was made to include all liquid hydrocarbons, such as condensate or distillate and natural gasoline. It will be noted that the minimum allowable was reached in May, 1942.

### ALLOWABLES SET BY FEDERAL AGENCY

**1942**

| Month | Allowable |
|---|---|
| January | 329,300 barrels per day crude oil |
| February | 335,000 barrels per day crude oil |
| March | 314,700 barrels per day crude oil |
| April | 313,000 Liquid Hydrocarbons, net 296,000 barrels crude oil |
| May | 298,600 Liquid Hydrocarbons, net 279,600 barrels crude oil |
| June | 311,300 Liquid Hydrocarbons, net 292,300 barrels crude oil |
| July | 319,600 Liquid Hydrocarbons, net 300,600 barrels crude oil |
| August | 332,600 Liquid Hydrocarbons, net 313,600 barrels crude oil |
| September | 334,800 Liquid Hydrocarbons, net 310,800 barrels crude oil |
| October | 337,200 Liquid Hydrocarbons, net 313,200 barrels crude oil |
| November | 333,800 Liquid Hydrocarbons, net 309,800 barrels crude oil |
| December | 326,100 Liquid Hydrocarbons, net 300,100 barrels crude oil |

**1943**

| Month | Allowable |
|---|---|
| January | 347,500 Liquid Hydrocarbons, net 320,500 barrels crude oil |
| February | 349,800 Liquid Hydrocarbons, net 318,800 barrels crude oil |
| March | 349,700 Liquid Hydrocarbons, net 320,800 barrels crude oil |
| April | 359,300 Liquid Hydrocarbons, net 333,300 barrels crude oil |
| May | 359,300 Liquid Hydrocarbons, net 331,300 barrels crude oil |
| June | 330,800 Liquid Hydrocarbons, net 303,800 barrels crude oil |
| July | 331,300 Liquid Hydrocarbons, net 308,300 barrels crude oil |
| August | 356,300 Liquid Hydrocarbons, net 329,300 barrels crude oil |
| September | 375,000 Liquid Hydrocarbons, net 348,000 barrels crude oil |
| October | 375,700 Liquid Hydrocarbons, net 358,700 barrels crude oil |
| November | 375,700 Liquid Hydrocarbons, net 350,700 barrels crude oil |
| December | 375,700 Liquid Hydrocarbons, net 350,700 barrels crude oil |

*Department of Conservation of Louisiana*    215

By August, 1943, our war activities had reached high development and that month marked the beginning of a period during which all the states were asked to produce practically all the oil that could be taken without injury to the wells and reservoirs, except where the transportation problems forced temporary "normality". This condition will probably persist until the end of the war.

Production of crude oil in Louisiana increased from 214,-888,995 barrels during the biennium of 1940-41 to 237,212,-842 barrels during the biennium of 1942-43, or an increase of 10.4% Production of crude oil increased from 117,177,958 barrels in 1942 to 120,034,884 barrels in 1943, or an increase of 2.4%. Average daily production of crude oil in 1943 was 328,862 barrels and in 1942 was 321,036 barrels.

Natural gas production increased from 699,428,439 M.C.F. (Thousand Cubic Feet) in 1940-41 to 979,039,633 M.C.F. in 1942-43, or an increase of 40.0% for the biennium. Production increased 11.0% in 1943 over 1942, from 463,-694,680 M.C.F. to 515,344,953 M.C.F.

Production of minerals generally increased greatly for the biennium of 1942-43 over 1940-41, averaging approximately 27.5%.

On January 1, 1942, the Petroleum Coordinator for National Defense issued Recommendation No. 28 which asked the states for preferential oil allowables to wells producing aviation types of crude. In compliance, the Division of Minerals issued on January 31, 1942, a circular for Louisiana, entitled "Instructions for Classifying 'Aviaton-Grade Crude Petroleum' and Specifications for 'Aviation-Grade Naptha' ". By this means there were established two types of Aviation-Grade Crudes and the oil lacking such properties was designated Type III. At least five per cent of Type I is required to yield 90 Octane number with 4cc of tetraethyl lead. Type II must have an Octane number of 73 with the aid of 1cc T.E.L. For both types the Reid vapor pressure at 100° F. cannot exceed seven pounds. It is also required that these napthas have a 90% point of 240° F. which is usually equivalent to an end point of 265° F. The distillation and testing specifications and methods are as required by Army-Navy Specifications AN-VV-F-776. The objective of Type I is 100 Octane gasoline with the aid of unsaturated compounds, called alkylates, and of the

T.E.L.  Similarly Type II must achieve at least 90 Octane rating.

On July 10, 1942, a statement was circulated to the operators, which stated that the July, 1942, allowable was made up as follows:

Type I    Aviation Crude    13.61%
Type II   Aviation Crude    64.93%
Type III  Aviation Crude    16.36%
Unclassified _____    5.10%
_____
100.00%

The preferential well allowable of Type I has exceeded Type II by about 25% and Type II has exceeded Type III by about 8.5%.  This arrangement as of the end of 1943 is shown below.

PERCENTAGES OF OIL PRODUCTION ASSIGNED TO
AVIATION TYPES AS OF DECEMBER, 1943

| Types | I | II | III | Unclassified | Production Crude* B.P.D. | Approximate No. Oil Wells |
|---|---|---|---|---|---|---|
| North Louisiana | 18.9 | 25.5 | 53.2 | 2.4 | 66,381 | 3,790 |
| South Louisiana | 15.2 | 80.2 | 1.8 | 2.8 | 268,921 | 2,870 |
| STATE | 15.9 | 69.4 | 12.0 | 2.7 | 335,302* | 6,660 |

*Does not include natural gasoline nor plant condensate, but some field condensate run as or with crude oil.

Although the determination of reserves of recoverable oil must be based on estimates, it is a well recognized condition that the discovery of new oil reserves during the biennium 1942-43 has not equaled the production.  This is also true for the United States as a whole.  New discoveries made in Louisiana are given below.

| | Oil | Gas-Condensate | Gas | Total |
|---|---|---|---|---|
| Year 1942 | 10 | 8 | 1 | 19 |
| Year 1943 | 16 | 9 | 0 | 25 |
| Biennium Total | 26 | 17 | 1 | 44 |

During 1943 the Commissioner and his staff held 101 public hearings on matters pertaining to oil and gas.  An approximate classification follows:

Unitization and/or Field Wells_____    34
Dual Completion of Wells_____    21
Readjustment of Unit Areas and/or Allowables    10

217

Bi-Monthly Allocation of Field Allowables ___ 6
Gas-Oil Ratios and Gas Production ___ 6
Allowable Shifts Account High Gas-Oil Ratios 5
Change of Drilling Locations—
    Exceptions to Orders ___ 5
Establishment of Field Rules ___ 4
Special Allowables to Prevent Waste ___ 3
Defining Producing Sands or Zones ___ 3
Application to Drill ___ 2
Unitization and Cycling ___ 1
Uncontrolled Well ___ 1

Total Hearings 1943 ___ 101

The hearings held in 1942 were of similar character and number at those summarized above for 1943. Hearings on the unitization comprise at least two phases. First an entire producing area may be unitized, spacing rules adopted and frequently the outlines of the included development unit areas shown on an "Official" map. When individual units comprise multiple property interests, it frequently happens that all the parties thereto will not voluntarily unitize or cannot be reached. The Commissioner has the power to force such unitization after hearing. Thus far all forced unitizations have been effected only in cases where the dissenter's interest was very minor. There has never been an order issued in refusal of such unitizations, which is a commentary on the forthright dealings and presentations of the applicants.

Louisiana is the only State that has such a prerogative. Act 157 of 1940 covers this novel feature and is now our principal basic law for oil and gas.

The unitization feature was attacked by the Hunter Company in the Civil District Court at New Orleans with reference to the Logansport gas field of DeSoto Parish. This Court (Judge Bond) ruled the unitization feature of Act 157 to be unconstitutional and enjoined the Commissioner from enforcing his field order. Suspensive Appeal was taken. The Supreme Court of Louisiana reversed the decision and passed on practically all of the questions involved. The case was taken to the Supreme Court of the United States where the plea of unconstitutionality was not established. This decision, though rather involved and indirect, is a distinct victory for